# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 20, 2006          Decided October 13, 2006

No. 03-1456

AMERICAN CHEMISTRY COUNCIL, ET AL.,
PETITIONERS

v.

DEPARTMENT OF TRANSPORTATION,
RESPONDENT

UTILITY SOLID WASTE ACTIVITIES GROUP, ET AL.,
INTERVENORS

———

Consolidated with
05-1191

———

On Petitions for Review of an Order of the
United States Department of Transportation

———

*Paul M. Donovan* argued the cause for petitioner. With him on the briefs was *Nicholas J. DiMichael*.

*William R. Weissman* and *Paul D. Ackerman* were on the brief for intervenors Utility Solid Waste Activities Group, et al. *Douglas H. Green* entered an appearance.

*Jonathan H. Levy*, Attorney, U.S. Department of Justice, argued the cause for respondent. On the brief were *Peter D. Keisler*, Assistant Attorney General, *Douglas N. Letter* and *August E. Flentje*, Attorneys, *Jeffrey A. Rosen*, General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General Counsel, and *Peter J. Plocki*, Senior Trial Attorney.

Before: SENTELLE, ROGERS and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Circuit Judge* ROGERS.

GRIFFITH, *Circuit Judge*: Several associations of hazardous materials manufacturers, shippers, and transporters challenge a Department of Transportation ("Department") rule defining when hazardous materials are being "load[ed], unload[ed], or stor[ed] incidental to the[ir] movement," 49 U.S.C. § 5102(13), which largely controls whether such materials will be subject to federal regulation by the Department under the Hazardous Materials Transportation Act, 49 U.S.C. § 5101, *et seq.* Because the associations have not demonstrated Article III standing under the United States Constitution to bring their challenge, we dismiss their petitions for review.

## I.

Congress enacted the Hazardous Materials Transportation Act (the "HMTA" or "Act") in 1975 to "improve the regulatory and enforcement authority of the Secretary of Transportation to protect the Nation adequately against the risks to life and property which are inherent in the transportation of hazardous materials in commerce." Pub. L. No. 93-633, § 102, 88 Stat. 2156, 2156 (1975) (codified as amended at 49 U.S.C. § 5101); *see generally id.* §§ 101-115, 88 Stat. at 2156-64 (codified as

amended at 49 U.S.C. §§ 5101-5128). A key feature of the Act is its broad mandate providing that the Secretary of Transportation (the "Secretary") "shall prescribe regulations for the safe transportation, including security, of hazardous materials in intrastate, interstate, and foreign commerce." 49 U.S.C. § 5103(b)(1). The Department has done so, resulting in the Hazardous Materials Regulations ("HMR"), found at 49 C.F.R. parts 171-180. This case involves continued efforts by the Department to comply with that mandate and develop regulations seeking to ensure "safe transportation." 49 U.S.C. § 5103(b)(1).

The Act provides that the Department's regulations:

(A) apply to a person who—

(i) *transports* hazardous material in commerce;

(ii) causes hazardous material to be *transported* in commerce;

(iii) designs, manufactures, fabricates, inspects, marks, maintains, reconditions, repairs, or tests a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in *transporting* hazardous material in commerce;

(iv) prepares or accepts hazardous material for *transportation* in commerce;

(v) is responsible for the safety of *transporting* hazardous material in

commerce;

(vi) certifies compliance with any requirement under this chapter; or

(vii) misrepresents whether such person is engaged in any activity under clause (i) through (vi); and

(B) shall govern safety aspects, including security, of the *transportation* of hazardous material the Secretary considers appropriate.

*Id.* § 5103(b)(1) (emphasis added). Thus, as the name of the Act suggests and the terms of the Act provide, the Department's regulatory authority under the Act often begins—and ends—with the phrase "transportation in commerce." *See also id.* ("[t]he Secretary shall prescribe regulations for the safe *transportation . . . in . . . commerce*") (emphasis added). This case focuses on the former term, transportation, as opposed to commerce. The Act defines "transports" or "transportation" as "the movement of property and loading, unloading, or storage incidental to the movement." *Id.* § 5102(13).

After initially promulgating the HMR, the Department "issued a number of interpretations . . . in response to public requests for clarification regarding the meaning of the term 'transportation in commerce' and whether particular activities fall under that term and, therefore, are subject to the HMR." Advanced Notice of Proposed Rulemaking, Applicability of the Hazardous Materials Regulations to Loading, Unloading, and Storage, 61 Fed. Reg. 39522, 39522 (July 29, 1996). In 1996, the Department sought "to consolidate, clarify, and revise, as necessary, these interpretations, rulings and decisions, and make them part of the HMR." *Id.* The Department requested

comments from the public in its Advanced Notice, held a series of public meetings, [66 Fed. Reg. 32420, 32420] sought further comments on approaches to defining "transportation," *see* Supplemental Advance Notice of Proposed Rulemaking, Applicability of the Hazardous Materials Regulations to Loading, Unloading, and Storage, 64 Fed. Reg. 22718, 22719-23 (Apr. 27, 1999), and then proposed "a list of specific functions to which the HMR apply and . . . the types of persons or entities responsible for compliance with the HMR," Notice of Proposed Rulemaking, Applicability of the Hazardous Materials Regulations to Loading, Unloading, and Storage, 66 Fed. Reg. 32420, 32421 (June 14, 2001).

After the Department's notice of proposed rulemaking, but prior to promulgation of its final rule, Congress amended the Department's mandate to add the phrase "including security" twice to § 5103(b). Homeland Security Act of 2002, Pub. L. No. 107-296, § 1711(a), 116 Stat. 2135, 2319 (2002). Section 5103(b)(1) thus directs the Secretary to "prescribe regulations for the safe transportation, *including security*, of hazardous material," *id.* (emphasis added), and to ensure that such regulations "govern safety aspects, *including security*, of the transportation of hazardous material the Secretary considers appropriate," *id.* § 5103(b)(1)(B) (emphasis added). The Department first issued its long-coming rule on October 30, 2003. Final Rule, Applicability of the Hazardous Materials Regulations to Loading, Unloading, and Storage, 68 Fed. Reg. 61906 (Oct. 30, 2003) (the "October 2003 Rule"). As relevant here, the Department sought to interpret the meaning of the statutory term "transportation," *see* 49 U.S.C. § 5102(13) ("'transportation' means the movement of property and loading, unloading, or storage incidental to the movement"), by defining four related terms: the "pre-transportation function," "loading incidental to movement," "unloading incidental to movement,"

and "storage incidental to movement." 68 Fed. Reg at 61907.[1] Several parties filed administrative appeals. The Department denied several of the appeals, but made substantive revisions to its rule in response to others. *See* Final Rule, Applicability of the Hazardous Materials Regulations to Loading, Unloading, and Storage, 70 Fed. Reg. 20018, 20020 (Apr. 15, 2005) (the "Final Rule").

In defining "pre-transportation function," the Department's Final Rule set out several specific "function[s] . . . that [are] required to assure the safe transportation of a hazardous material in commerce." 70 Fed. Reg. at 20033 (codified at 49 C.F.R. § 171.8). It concluded that these enumerated "pre-transportation functions" would be subject to regulation under the HMR when performed by any person. *See* 68 Fed. Reg. at 61937 (codified at 49 C.F.R. § 171.1(b)). In contrast, the Department concluded that it would not regulate the unloading of hazardous materials when, generally speaking, a shipping company leaves the premises of a receiver of hazardous materials. *See* 70 Fed. Reg. at 20032 (codified at 49 C.F.R. § 171.1(c)(3)). "Unloading incidental to movement" was defined as

> removing a . . . containerized hazardous material from a transport vehicle . . . , or for a bulk packaging, emptying a hazardous material from the bulk packaging after the hazardous material has been delivered to the consignee when performed by carrier

---

[1] The Act's definition of "transportation" uses the phrase "incidental to the movement" once, after the term "storage," *see* 49 U.S.C. § 5102(13). The Department's rule reads that phrase as modifying, in addition to "storage," both "loading" and "unloading." Thus, the Department sought to define "loading incidental to movement," "unloading incidental to movement," and "storage incidental to movement." 68 Fed. Reg at 61907.

> personnel or in the presence of carrier personnel or, in the case of a private motor carrier, while the driver of the motor vehicle from which the hazardous material is being unloaded immediately after movement is completed is present during the unloading operation.

*Id.* at 20034 (codified at 49 C.F.R. § 171.8). The Department defined "loading incidental to movement" to mean the "loading by carrier personnel or in the presence of carrier personnel of . . . hazardous material onto a transport vehicle . . . for the purpose of transporting it." 68 Fed. Reg. at 61940 (codified at 49 C.F.R. § 171.8). Finally, the Department determined "storage incidental to movement" means

> storage of a transport vehicle . . . containing a hazardous material by any person between the time that a carrier takes physical possession of the hazardous material for the purpose of transporting it in commerce until the package containing the hazardous material is physically delivered to the destination indicated on a shipping document, package marking, or other medium, or, in the case of a private motor carrier, between the time that a motor vehicle driver takes physical possession of the hazardous material for the purpose of transporting it in commerce until the driver relinquishes possession of the package at its destination and is no longer responsible for performing functions subject to the HMR with respect to that particular package.

70 Fed. Reg. at 20033 (codified at 49 C.F.R. § 171.8).

The American Chemistry Council and several other trade associations filed a petition for review of the October 2003 Rule in this Court on December 29, 2003. These same petitioners

filed another petition for review of the Final Rule on June 8, 2005. We have jurisdiction to review petitioners' timely challenge pursuant to 49 U.S.C. §§ 5127(a), 20114(c) and 28 U.S.C. § 2342(7).[2]

Petitioners challenge several aspects of the Department's Final Rule. Specifically, petitioners argue that (1) the Department's definitions were contrary to the intent of Congress as expressed in the Act; (2) the Department failed to adequately consider or address the security implications of its Final Rule, as required by the Homeland Security Act of 2002; (3) the Department failed to clearly articulate the legal, factual, and policy reasons for its Final Rule; and (4) the Department failed to address the substantive comments of "various parties." Petitioners' Br. at 4-5.

## II.

---

[2] As noted, the Final Rule was issued in response to several administrative appeals. Intervenor Utility Solid Waste Activities Group brought one of those administrative appeals, *see* 70 Fed. Reg. at 20020, while also intervening in the petition for review filed in No. 03-1456, which challenges the October 2003 Rule. "[O]ur cases treat a petition for review filed during the pendency of a request for administrative reconsideration as 'incurably premature.'" *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1250 (D.C. Cir. 2003). Because we conclude that no petitioner or intervenor has demonstrated standing, a jurisdictional basis for dismissal, we need not reach a holding on incurable prematurity. *See, e.g., Hwang Geum Joo v. Japan*, 413 F.3d 45, 48 (D.C. Cir. 2005) (while "[t]he court must . . . 'address questions pertaining to its or a lower court's jurisdiction before proceeding to the merits,'" the Supreme Court has "not dictate[d] a sequencing of jurisdictional issues") (quoting *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005), and discussing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)) (quotation marks omitted).

9

"Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, *see, e.g.*, *Chi. & Grand Trunk Railway Co. v. Wellman*, 143 U.S. 339, 345 (1892), a showing of standing 'is an essential and unchanging' predicate to any exercise of our jurisdiction." *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). An association, such as each of the petitioner- and intervenor-associations, "'has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). Because we conclude that petitioners and intervenors have failed to demonstrate "that at least one member . . . has standing to pursue this challenge," *Am. Library Ass'n. v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005), we need only address this first element of associational standing set forth in *United Food* and *Washington Apple*.

"[T]he irreducible constitutional minimum of standing contains three elements." *Defenders of Wildlife*, 504 U.S. at 560. "First, the plaintiff must have suffered an injury in fact . . . which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* (quotation marks and citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (quotation marks and alterations omitted). "Third, it must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (quotation marks omitted).

In describing which members would have standing to bring suit in their own right, petitioners' opening brief asserted generally that "[t]he record of this rulemaking proceeding demonstrates that each association has numerous members that are subject to the rules at issue, and would have individual standing to file for review of the final rule" and "[t]hus, each petitioner has standing to challenge the final rule." Petitioners' Br. at 2. Intervenors, on the other hand, offered two specific theories of standing: (1) "[b]ecause of [the Department's] failure to regulate as broadly as the statute directs, [intervenors'] members, as well as the industries represented by petitioners, face substantial burdens including overlapping, duplicative and sometimes inconsistent state and local hazardous transportation-related requirements" and (2) "they face increased liability risks associated with gaps in federal oversight over the safe and secure transportation of hazardous materials." Intervenors' Br. at 6-7. The Department did not question standing in its brief, although it suggested to the Court that "[t]his is an unusual case in that petitioners, associations of hazardous materials manufacturers, shippers, and transporters, are suing the Department of Transportation asking to be *more* extensively regulated under the federal statute governing the transportation of hazardous materials." Respondent's Br. at 8 (emphasis added). Given that this case involves, as the Department also put it in its brief, an "atypical request" by industry associations to require an agency to regulate their industry more pervasively, *id.*, we raised the issue of standing at oral argument and requested supplemental briefing. *See Am. Library Ass'n v. FCC*, 401 F.3d 489, 490-95 (D.C. Cir. 2005). In their supplemental brief, petitioners assert two theories of standing, which we discuss in turn.

A. *The Department's Alleged Failure to Preempt the Los Angeles County Fire Code.*

Petitioners argue that the Department has failed to regulate as broadly as they believe the Act requires and that, because of that failure, "burdensome state and local requirements that would have been preempted" by the Act continue to apply to their members. Petitioners' Supp. Br. at 4. Petitioners base this theory of standing entirely on the alleged injury of one member. Hasa Inc., a California-based company, produces liquid sodium hypochlorite, a chemical used in sanitizing swimming pools and spas, and is a member of petitioner The Chlorine Institute. Decl. of Mark Wilson ¶ 2. Hasa regularly receives railroad tank cars containing compressed chlorine gas. *Id.* ¶ 3. Each time a new car is needed, it is brought onto a railroad track adjacent to Hasa's production plant, and Hasa withdraws gas from the car as required to produce its product. *Id.* The Los Angeles County Fire Department issued a "Violation Notice" to Hasa on July 2, 2003 "requiring the construction of a large ventilated building over the railroad track siding adjacent to the Hasa plant production area (hereafter called the 'Barn')." *Id.* ¶ 4. Hasa has since retained architects and engineers to produce plans for constructing the Barn, which have been submitted to the Fire Department for approval. *Id.* ¶ 5.[3] Building the Barn "will be

---

[3] The declaration from Hasa states that the Violation Notice "contained alleged violations 1 and 2, among others, *which have all now been corrected*, requiring the construction of" the Barn. *Id.* ¶ 4. The declaration does not explain why Hasa is still required to build the Barn if "all" of the violations have "now been corrected." *Id.* If all of the violations at issue have since been corrected, Hasa's injury might be moot. We assume *arguendo* that the Los Angeles County Fire Department is still requiring Hasa to build the Barn notwithstanding the fact that all violations listed on the July 2, 2003 Violation Notice have been corrected.

very expensive" and, Hasa alleges, "will unreasonably burden the movement of the railroad tank cars on the adjacent railroad tracks . . . as well as unreasonably burden the offloading of the gaseous chlorine by Hasa." *Id.* ¶ 7.

Petitioners direct the Court to several provisions of the Los Angeles County Fire Code ("Fire Code") that they argue would be preempted if the Department adopted their broader version of the Final Rule. Petitioners only allege, however, that two provisions of the Fire Code are being applied to Hasa and we thus only examine whether petitioners have demonstrated an injury in fact with respect to those two provisions.

A declaration submitted by petitioners attests that Hasa is being required to construct the Barn pursuant to Title 32, Los Angeles County Fire Code §§ 8003.3.1.3.5.2 and 8004.2.3.7.1. Decl. of Sasha N. Browner ¶ 7. Section 8004.2.3.7.1 provides that "[t]ank vehicles or railroad tank cars engaged in the use or dispensing of toxic or highly toxic gases shall be within a ventilated separate gas storage room or placed within an exhausted enclosure." L.A. COUNTY, CAL., FIRE CODE § 8004.2.3.7.1 (2001). Section 8003.3.1.3.5.2 requires such rooms to have a "treatment system" that is "capable of diluting, absorbing, containing, neutralizing, burning, or otherwise processing the entire contents of the largest single tank of gas stored or used." *Id.* § 8003.3.1.3.5.2. Thus, petitioners claim Hasa is "facing an injury in fact that is both concrete and particularized as well as actual and imminent" because Hasa will have to build the Barn pursuant to the Fire Code. Petitioners' Supp. Br. at 6.

Petitioners assert that, in requiring Hasa to build the Barn, "[t]he *unloading* requirements in Los Angeles County go far beyond anything contained in [the Department's] regulations." Petitioners' Supp. Br. at 5 (citing 49 C.F.R. § 174.67(a)(1)

("*[u]nloading* operations must be performed by hazmat employees properly instructed in *unloading* hazardous materials")) (emphasis added). Petitioners' brief asserts only that Los Angeles County's *unloading* requirements affect Hasa, and it thus appears Hasa has been injured, at most, by the Department's definition of the statutory term "unloading." *See* 49 U.S.C. § 5102(13). Thus, even if that alleged injury were otherwise sufficient to demonstrate Hasa's standing, it would not provide a basis for challenging the Department's efforts to define "pre-transportation function," "loading," and "storage." *See* 49 C.F.R. § 171.8.

But it is not otherwise sufficient to establish Hasa's standing. Although petitioners have demonstrated that Hasa has an injury in fact (*i.e.*, it will have to build and use a ventilation system that it would otherwise not build or use), petitioners have not demonstrated that Hasa's injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," nor that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 560-61 (alterations and quotation marks omitted). Petitioners have not demonstrated that the Department is fairly responsible for Hasa's injury and that if the Court sets aside the Department's Final Rule, it is likely that a future rule promulgated by the Department would stop Los Angeles County from requiring Hasa to build the Barn. Petitioners' failure to do so results from their failure to demonstrate that the local regulations affecting Hasa would likely be subject to the Act's preemption provisions, set forth in 49 U.S.C. § 5125.

Section 5125 of the Act contains several preemption provisions that, if applicable, might set aside a state or local law. Subsection (a)(1) provides that state or local regulation "is preempted if . . . complying with a requirement of the State [or]

political subdivision . . . and a . . . regulation prescribed under this chapter . . . is *not possible*." *Id.* (emphasis added). Subsection (a)(1) also provides for preemption where "the requirement of the State [or] political subdivision . . . , as applied or enforced, is *an obstacle* to accomplishing and carrying out . . . a regulation prescribed under this chapter." *Id.* (emphasis added). Subsection (b) calls for seemingly broader preemption with respect to state or local efforts to regulate specific, enumerated subjects. When subsection (b) applies, state or local laws that are "not substantively the same," *id.* § 5125(b)(1), as federal hazardous material law will be preempted.[4]

---

[4] Specifically, subsection (b)(1) applies to state or local regulations that are "about any of the following subjects:"

(A) the designation, description, and classification of hazardous material.

(B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.

(C) the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of those documents.

(D) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material.

(E) the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

Petitioners' theory regarding which provision of § 5125 would preempt the Los Angeles County Fire Code from being applied to Hasa is nonexistent. Petitioners state, in one sentence, that "[a]s a result of [the Department's] action and in light of the attached declarations, there can be no doubt that Hasa is facing substantial local regulatory requirements that, but for the ceding of the jurisdiction by [the Department] in the final . . . rule, would have been subject to the HMTA's preemption provision. 49 U.S.C. § 5125." Petitioners' Supp. Br. at 6. That sentence, and another similar conclusory sentence, *see id.* at 4, are petitioners' only reference to the Act's detailed preemption provisions. Petitioners never explain how any of the preemption provisions in § 5125 make it "likely," *see Defenders of Wildlife*, 504 U.S. at 561, that Hasa would not have to construct the Barn if the Court were to set aside the Department's Final Rule.

Petitioners have not shown, for example, that a future rule promulgated by the Department would likely preempt, under subsection (a)(1) of § 5125, the Los Angeles County ordinances being applied to Hasa. Petitioners have not explained why it would be "not possible," 49 U.S.C. § 5125(a)(1), to comply with both Los Angeles's requirement that Hasa build the Barn and the Hazardous Materials Regulations. Nor have petitioners developed a theory regarding why building the Barn would be "an obstacle to . . . carrying out" the HMR. *Id.* § 5125(a)(2). Petitioners similarly have not demonstrated that subsection (b) would preempt Los Angeles's ordinance, as none of the enumerated subjects to which subsection (b) apply involve unloading, *see id.* § 5125(b)(1) (reprinted in note 4), the subject being regulated by Los Angeles County.

In any event, the Act provides that "the Secretary may waive preemption" upon deciding that a state or local

---

49 U.S.C. § 5125(b)(1).

requirement "(1) provides the public at least as much protection" as federal regulation and "(2) is not an unreasonable burden on commerce." *Id.* § 5125(e). The Secretary's ability to waive preemption constitutes yet another obstacle for petitioners to overcome in demonstrating that preemption is likely. But petitioners have made no argument or showing regarding the likelihood of a waiver. Absent such a showing, petitioners' broad assertion that these two provisions of the Los Angeles County Fire Code would be preempted appears even more "speculative." *Defenders of Wildlife*, 504 U.S. at 561.

B. *The Existence of a Regulatory "Gap" or "Void."*

As an alternate theory of standing, petitioners contend that the Department's Final Rule has left their members with a "gap in safety regulation" or "void" such that "members of Petitioners that ship hazardous materials . . . cannot rely upon any meaningful federal or state regulations to protect either their products or the tank cars in which those products move." Petitioners' Supp. Br. at 7, 9. In so arguing, petitioners bore "the burdens of production and of proof: [they] 'must support each element of [their] claim to standing by affidavit or other evidence'" and their "'burden of proof is to show a substantial probability,'" *GrassRoots Recycling Network, Inc. v. EPA*, 429 F.3d 1109, 1112 (D.C. Cir. 2005) (quoting *Sierra Club*, 292 F.3d at 899), that the Final Rule "causes at least one of its members an injury that is 'concrete and particularized' and 'actual or imminent,' not 'conjectural or hypothetical,'" *GrassRoots*, 429 F.3d at 1112 (quoting *Defenders of Wildlife*, 504 U.S. at 560)). Where an organization alleges associational standing, it must show "that at least one member . . . has standing to pursue [its] challenge," *Am. Library Ass'n. v. FCC*, 406 F.3d 689, 696 (D.C. Cir. 2005). But petitioners have failed to meet this burden because they neither argued nor directed the Court to evidence that any of their specific members has suffered a "concrete and

particularized" harm that is "actual or imminent."

In *Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002), this Court held that "a petitioner whose standing is not self-evident [from the administrative record] should establish its standing by the submission of its arguments and any affidavits or other evidence[.]" *Id.* at 900. In the opening round of briefs on appeal, petitioners only hinted at the possibility of associational standing by stating no more than that "each association has numerous members that are subject to the rules at issue, and would have individual standing to file for review of the final rule." Petitioners' Br. at 2. Not finding standing self-evident, we granted leave to petitioners and respondent to submit supplemental briefs on the issue, which gave petitioners another opportunity to make their argument by directing us to portions of the record or by submitting affidavits or other evidence that show their standing.

In response, petitioners submitted no affidavits or other forms of evidence. Instead, they relied entirely upon citations to the record. Petitioners claimed only in a most general fashion that "[t]he extensive administrative record in this case reflects that Petitioners' members operate facilities in most, if not every, state and in scores of local jurisdictions around the country." Petitioners' Supp. Br. at 7. Petitioners then directed us to comments in the record submitted to the Department by the National Transportation Safety Board ("NTSB") and suggest that they demonstrate that the Department improperly "assume[d] that the states and localities have regulations in place that will provide the safety and security protections" that petitioners seek. *Id.* But, not surprisingly since the NTSB's comments were not written for the purpose of demonstrating petitioners' standing, petitioners have not been able to show how those comments evidence that at least one of their members has suffered an "actual or imminent, not conjectural or hypothetical"

injury because of this alleged regulatory void. *Defenders of Wildlife*, 504 U.S. at 560 (quotation marks omitted).

Petitioners also directed the Court to a brief comment made to the Department by the American Chemistry Council ("ACC") expressing a "*concern*[] . . . [that] states and/or localities have not demonstrated an ability to regulate in these areas and [the Department] has not made an effort to address the safety consequences of its proposed actions." Joint Appendix ("J.A.") at 319 (emphasis added). But petitioners have not explained how this comment shows an injury in fact suffered by a specific member.

While shedding some light on the general danger that may come from a regulatory void, the NTSB's comments and the ACC's comment, even when taken together, fall short of establishing certainly impending dangers for any particular member of the petitioners' associations. The comments do not indicate, for example, that any of petitioners' members have been or will be working in specific areas with safety concerns. It is not enough to allege that petitioners' associations comprise the majority of the workers who handle hazardous materials. Petitioners' Supp. Br. at 7; J.A. at 113 and 120. Lacking any affidavits from petitioners' members alleging actual or imminent injury or other evidence to that effect, the Court can find the necessary harm only by assuming a link between the petitioners' comments in the administrative record and the proposition that at least one member of the association faces imminent dangers. We decline to assume missing links for reasons we gave in *Sierra Club*:

> The facts upon which a petitioner relies for its standing to sue are necessarily peculiar to it and are ordinarily within its possession; indeed it is often the case . . . that some of the relevant facts

> are known only to the petitioner, to the exclusion of both the respondent and the court. Yet all too often the petitioner does not submit evidence of those facts with its opening brief and the respondent is therefore left to flail at the unknown in an attempt to prove the negative.

*Id*. at 901. If petitioners' claim to standing arises out of safety concerns for their members, they should easily have access to information concerning whether any one of their members has been harmed or faces a substantial probability of being harmed by lax state regulation. Petitioners had at least two opportunities to submit evidence to show standing for one of their members, and the Court is still left to wonder who, if anybody, has suffered an injury-in-fact. Since the NTSB's comments and ACC's comment do not meet the requirement that the evidence submitted, whether offered in the form of "affidavits or other evidence," must sufficiently establish the imminent nature of the harm to one of petitioners' members, we hold that petitioners failed to "supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review." *Sierra Club*, 292 F.3d at 900.

Absent declarations or citations to the record from petitioners that establish a concrete harm to one of petitioners' members, the Court is left to wonder, for example, (1) whether petitioners suffer from a concrete, particularized, and imminent injury in fact; (2) why petitioners cannot protect their "products or the tank cars in which those products move," Petitioners' Supp. Br. at 9, through voluntary self-regulation or private contracts; (3) whether any alleged injury is fairly traceable to the Department as opposed to petitioners themselves or state and local regulators; and (4) how setting aside the Department's Final Rule would likely remedy any alleged injury. Nonetheless, we do not suggest that petitioners could not

possibly have demonstrated standing to challenge the Department's alleged failure to regulate. We need not, and do not, express any opinion on whether the manufacturers, shippers, and transporters in this case could have provided evidence of their standing to pursue the challenges they bring to the Department's Final Rule. It suffices to say that, when given an opportunity to do so, petitioners did not.

Contrary to the suggestion in the dissenting opinion, we are not requiring an actual past injury to petitioners to establish an injury-in-fact. We hold only that (i) "the injury complained of be, if not actual, then at least imminent[.]" *Defenders of Wildlife*, 506 U.S. at 564 n.2, and just as importantly for these petitioners, (ii) that an organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact. It is not enough to show, as the dissent argues from its observation that petitioners are part of the industry being regulated by the Final Rule, that there is a substantial likelihood that at least one member may have suffered an injury-in-fact. Our standard has never been that it is *likely* that at least one member has standing. At the very least, the identity of the party suffering an injury in fact must be firmly established. The dissent cites persuasive authority to make a point that we do not contest: Article III does not require actual harm. We agree. Indeed, as *Defenders of Wildlife* makes clear, imminent harm will suffice. *Id.* But none of the cited cases diminish petitioner's burden to produce evidence of the imminent nature of a specific harm to a specific party when an actual harm is absent. That is where petitioners have failed. In fact, in each of the cases cited by the dissent either an actual harm (economic, aesthetic, or procedural) was present or the imminent nature of the harm to a specific entity or person was sufficiently established through affidavits or other evidence. *See Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150 (1970) (finding competitor standing for data

processing companies since evidence of impending loss of two customers sufficiently established imminent economic harm); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) (holding that plaintiff's desire to canoe nearby a polluted wastewater discharge "adequately documented injury in fact" without showing any physical injury on the plaintiff's part since "aesthetic and recreational values" derived from the affected area were already lessened); *Defenders of Wildlife*, 504 U.S. at 573 n.7 (noting that since "procedural rights" are special, a "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy"); *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277 (D.C. Cir. 1988) (finding associational standing since certain members of the organization submitted affidavits to establish past and future economic harm).

For the same reasons discussed above, intervenors, too, have failed to establish that at least one party has standing. Intervenors assert a basis for standing similar to petitioners' theory of a regulatory void, positing that

> [the Department] improperly narrowed the scope of the regulated universe so that instead of facing uniform national regulatory standards as contemplated by the HMTA, intervenors face a hodge-podge of varying state and local requirements and standards that would be superseded by a properly issued federal regulation under the Act's preemption provision. 49 U.S.C. § 5125.

Intervenors' Br. at 6. Intervenors offer a string cite to the first page of various comments filed before the Department, but have not explained how any of their members suffers an injury-in-fact. Nor have intervenors introduced arguments and evidence

attempting to substantiate their "hodge-podge" theory—that there are inconsistent state and local regulations, which a properly-issued Final Rule would have preempted, and that the failure to preempt these inconsistent regulations causes redressable injury in fact. Alternatively, intervenors assert in a sentence that "they face increased liability risks associated with gaps in federal oversight over the safe and secure transportation of hazardous materials," Intervenors' Br. at 6-7, but again have introduced no evidence whatsoever to support such a claim. Thus, intervenors, too, have failed to meet their burden of establishing a substantial probability that the Final Rule causes at least one member an injury in fact.[5]

## III.

---

[5] Intervenors also note that in *Association of American Railroads v. Costle*, 562 F.2d 1310, 1311 (D.C. Cir. 1977), we concluded an agency acted contrary to law in adopting an "artificially narrow definition" of a statutory term. *Id.* We do not doubt that, as in *Costle*, we may set aside an agency's "misinterpret[ation] [of a] clear statutory mandate to regulate" and may "direct that the [agency] . . . promulgate standards in accordance with the statutory mandate." *Id.* at 1321. In this case, the Act directs the Secretary to promulgate regulations that "shall govern safety aspects, including security, of the transportation of hazardous material *the Secretary considers appropriate*," 49 U.S.C. § 5103(b)(1)(B) (emphasis added), which might make it more difficult to show that the Department has acted contrary to a "clear statutory mandate," 562 F.2d at 1321, and, in any event, emphasizes the need for petitioners to have demonstrated how they have standing to challenge the Secretary's failure to develop such regulations. But before a party is entitled to the relief discussed in *Costle*, it undoubtedly must establish its standing to seek such relief. *See Laidlaw*, 528 U.S. at 185. *Costle* contains no discussion of standing and is thus of limited relevance in determining whether petitioners and/or intervenors have demonstrated standing.

The petitions for review are dismissed.

*So ordered.*

ROGERS, *Circuit Judge*, dissenting: Adhering to instruction from the Supreme Court, this court explained in *Sierra Club v. EPA*:

> In many if not most cases the petitioner's standing to seek review of administrative action is self-evident; no evidence outside the administrative record is necessary for the court to be sure of it. In particular, if the complainant is "an object of the action (or forgone action) at issue" – as is the case usually in review of a rulemaking and nearly always in review of an adjudication – there should be "little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."

292 F.3d 895, 899-900 (D.C. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992)). In this case, a review of the administrative record shows that standing is self-evident.

The petitioners and the intervenors (hereafter, "petitioners") are trade associations that represent the manufacturers, shippers, and transporters of hazardous materials.[1] The final rule of the

---

[1] The petitioners are the American Chemistry Council; the American Petroleum Institute; American Trucking Associations, Inc.; Chlorine Institute, Inc.; the Compressed Gas Association; the National Association of Chemical Distributors; the National Industrial Transportation League; the National Paint and Coating Association; National Tank Truck Carriers, Inc.; and the Synthetic Organic Chemical Manufacturers Association. The petitioners' brief states that "[e]ach is a continuing association of numerous individual companies, and each is operated for the purpose of promoting the general commercial, professional, legislative, or other interests of their respective memberships." Petitioners' Br. at ii. The intervenors are the Edison Electric Institute, which represents investor-owned electric

Department of Transportation ("Department") subjects the associations' members to federal regulation when handling hazardous materials during shipment and transport. *See* Applicability of the Hazardous Materials Regulations to Loading, Unloading, and Storage, 70 Fed. Reg. 20,018 (Apr. 15, 2005); Applicability of the Hazardous Materials Regulations to Loading, Unloading, and Storage, 68 Fed. Reg. 61,906 (Oct. 30, 2003) (collectively, the "final rule"). However, the final rule leaves unregulated the unloading of hazardous materials, creating a void to be filled by state and local authorities. During rulemaking, the regulated industry set forth its concerns that gaps in the final rule increased the risk of injury both to the public and to members' employees who handle hazardous materials. As materials submitted by the federal review board charged with investigating "hazmat" accidents confirm, these concerns are clearly non-conjectural. Under the circumstances, an association whose members are subject to the challenged rule has self-evidently met its burden to demonstrate that it has standing to seek vacation of the final rule. *See Defenders of Wildlife*, 504 U.S. at 560-61; *Motor & Equipment Mfrs. Ass'n v. Nichols*, 142 F.3d 449 (D.C. Cir. 1996). Here, petitioners maintain that (1) the rule fails to conform with congressional intent, and (2) the Secretary, in promulgating the final rule, failed to address comments raising material concerns. *See* Op. at 8.

Petitioners state in their opening brief that they represent "members [that] transport, offer for transportation or cause to be offered for transportation hazardous materials. . . . The record

---

utility companies; the American Gas Association, which represents natural gas utilities; the National Rural Electric Cooperative Association; the American Public Power Association; and the Utility Solid Waste Activities Group, which represents "approximately 80 individual electrical utilities." Intervenors' Br. at ii-iii.

of this rulemaking proceeding demonstrates that each association has numerous members that are subject to the rules at issue, and would have individual standing to file for review of the final rule." Petitioners' Br. at 2; *see id.* at ii (enumerating petitioners); Intervenors' Br. at 5-7 (asserting standing as to intervening electric and gas utility trade associations who "use, generate, transport and dispose of hazardous materials"). A sampling of the record references cited by petitioners suffices to support this statement and thus to show that it is self-evident that at least one member of the petitioner-associations has standing to challenge the final rule. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996); *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). In supplemental briefs on standing, petitioners submitted additional citations to the administrative record in support of two theories, based on (1) the burdens and dangers resulting from a hodge-podge of state and local requirements and (2) the increased liability risks associated with gaps in federal oversight. *See* Op. at 11, 16. Together, the record citations establish that the associations of shippers and carriers properly stand before this court as parties who have been aggrieved by a rule for which they are "an object of the . . . forgone action[] at issue." *Defenders of Wildlife*, 504 U.S. at 561.

Although it cannot be gainsaid that the court must assure itself that the parties have standing, the administrative record here cannot fairly be read to leave the court unconvinced, as petitioners have fully met their burden as to the well-rehearsed requirements of injury-in-fact, causation, and redressability. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004); *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 280-87 (D.C. Cir. 1988). The record plainly supports the theories advanced by petitioners, namely that the Secretary, by failing to set a national standard for unloading, has left

petitioners' members' employees and the public more susceptible to accidental injury. Representatives of the regulated industry and the National Transportation Safety Board ("NTSB") have attested to the burdens of compliance and the security and safety gap that accompanies the unreliable hodge-podge of state, county, and local requirements for unloading in the absence of a federal standard.

For example, petitioner American Chemistry Council ("ACC"), stating that it "represents the leading companies engaged in the business of chemistry . . . and is America's #1 exporter – with more than $80 billion in exports in 2000" and that its members represent "more than 90% of the productive capacity of basic industrial chemicals in the United States and a large portion of the regulated hazardous materials shipping community," Joint Appendix ("J.A.") at 314, commented that *regulatory gaps* would result in compromised safety because the Department has considerable expertise as to loading and unloading that states and localities have not demonstrated; yet, the ACC noted, no effort has been made by the Department to assess the safety consequences of the lack of federal regulation. *Id.* at 319-20. Petitioner National Association of Chemical Distributors ("NACD"), stating that it "is the leading association of chemical distribution companies in the United States," noted a "serious risk of safety and compliance gaps," expressing concern about an "*incomprehensible patchwork of requirements* [by state and local governments that will] diminish safety and slow . . . shipments." *Id.* at 236-37 (emphasis added). The NACD warned: "The result will be *over-handling* of hazardous materials and more opportunities of accidents, incidents, and injuries." *Id*. at 237 (emphasis added). Petitioner Utility Solid Waste Activities Group ("USWAG"), stating that its members represent 85% of the total electric generating capacity in the United States and service more than 95% of the nation's consumers of electricity and 93% of consumers of natural gas,

*id.* at 325, commented on the high costs of additional training needed in order to comply with state and local requirements for unloading, *id.* at 327-28. USWAG commented further that, in the absence of federal regulation, transportation risk cannot fully be controlled by relying on fixed-facility unloaders (who may lack complete knowledge of each transport vehicle) or drivers (who may lack complete knowledge of local requirements). *Id.* at 331. Detroit Edison, a shipper and carrier and member of USWAG, expressed concern about both the operational impact of the absence of a federal standard on unloading and the costs associated with training employees to comply with state and local regulations as well as the impact of such costs and the consequential costs of potential liability on its competitive position. *Id.* at 310-12.

Consequently, the court's standing analysis is flawed in two respects. First, the court has no warrant to ignore the administrative record when assessing standing. Second, the court incorrectly insists upon proof of actual past injury, *see* Op. at 16-20, when none is required to establish imminent and non-conjectural injury-in-fact.

The instructions of this court in *Sierra Club* and of the Supreme Court in *Defenders of Wildlife* obligate this court to consider the administrative record when evaluating the standing of a regulated party. How can standing ever be "self-evident" from the administrative record unless the court examines that record? Instead the court disregards the evidence from the administrative record cited in petitioners' briefs. The court reasons that the affidavit attached to the supplemental brief fails to demonstrate that a federal unloading standard would preempt the local requirement, Op. at 15, and that there is no evidence that one of petitioners' members has, in fact, suffered an actual injury caused by the rule, Op. at 16-20. The evidence of injury can be found in the administrative record. *See* Petitioners' Supp.

Br. at 8 (citing J.A. at 319-20, addressing the regulatory gap, and J.A. at 212-19, 222-23, regarding the NTSB's concerns); Intervenors' Br. at 7 (referencing, *inter alia*, statements by USWAG and American Chemistry Council cited *supra*). To the extent that the court's opinion implies a reluctance to credit record materials that are not also cited in the party briefs, this is inconsistent not only with the premise that standing can be "self-evident" from the administrative record, it is also inconsistent with our precedent, as in *American Library Ass'n v. FCC*, 401 F.3d 489, 491 (D.C. Cir. 2005), where the court found inadequate support for standing only after reviewing the administrative record.

Moreover, the contents of the administrative record establish injury-in-fact that is imminent and non-conjectural and satisfies the requirements of causation and redressability. "Actual" injury is not necessary to demonstrate injury-in-fact. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (finding the desire to canoe nearby a polluted wastewater discharge "adequately documented injury in fact" without the need to be injured by the pollution); *Defenders of Wildlife*, 504 U.S. at 573 n.7 ("[U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years."); *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152 (1970) (finding "competitor standing" where a Comptroller's ruling "might entail some future loss of profits" for petitioners). Although the court professes not to be requiring evidence of actual injury, *see* Op. at 20, its analysis suggests otherwise, as the court is unbothered by the logical inevitability of injury to petitioners'

members. Indeed, as this court held in *Hazardous Waste*, "a national trade organization of firms engaged in the treatment of hazardous waste and the manufacture of equipment for that purpose . . . has standing insofar as it represents members on whom regulatory laxity *may* inflict environmental injury." 861 F.2d at 280 (emphasis added). This is precisely the concern expressed by industry in the administrative record here.

The non-conjectural nature of the industry's safety concerns is borne out by the comments from the NTSB in the administrative record. The NTSB is charged with investigating accidents involving the handling of hazardous materials, 49 U.S.C. § 1111(g); 49 C.F.R. § 831.2(c); *see, e.g.*, *Louisville & Nashville R.R. Co. v. Sullivan*, 617 F.2d 793, 797 (D.C. Cir. 1980), and "evaluat[ing] the adequacy of safeguards and procedures for the transportation of hazardous material." 49 U.S.C. § 1116. Following investigations of "hazmat" accidents in 1998 and 1999, the NTSB urged the Secretary to complete rulemaking as to "safety requirements for loading and unloading hazardous materials." J.A. at 211-12. The NTSB subsequently reiterated this request, twice in 2001, because its review of accidents led it to consider national standards "an essential part" of effective regulation. *Id.* at 212. The NTSB employs reasoning similar to that of petitioners, thereby underscoring the gravity of their claims.

In light of *Hazardous Waste*, and the other precedent cited, the record comments regarding the likelihood of harm to members' employees suffice to show injury-in-fact. *See generally Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472-76 (1982); *Flast v. Cohen*, 392 U.S. 83, 99 (1968). The court relies upon *Defenders of Wildlife* to heighten the evidentiary burden but fails to recognize that, in *Defenders of Wildlife*, the plaintiff's injury arose from the allegedly unlawful regulation

(or lack thereof) of *a third party*, leading to enhanced requirements of causation and redressability. 504 U.S. at 562; *see* Op. at 9, 13, 15, 16, 17-18, 20, 21 (citing *Defenders of Wildlife*). The nexus between the final rule and the risks of injury identified by the regulated industry and by the NTSB are not in doubt; granting the petitions would afford petitioners a meaningful remedy. Additionally, the court's attempt to limit its holding by stating it does not presume that petitioners would be unable to show their standing to challenge the rule, Op. at 19-20, fails. Contrary to precedent, its analysis of why petitioners have failed to show injury-in-fact disregards the administrative record and establishes a heightened evidentiary threshold.

Understandably, in view of the precedent, the government has not suggested that petitioners lack standing, although invited to do so during oral argument when the court, *sua sponte*, first raised the issue. According to the court today, however, it is not sufficient that petitioners represent the bulk of the regulated industry that will be directly affected by the final rule. Nor is it sufficient that petitioners have provided citations to the administrative record that establish the non-conjectural nature of industry concerns with the final rule as it affects the risks to public and employee safety. Nor is it sufficient that petitioners' briefs identified safety concerns, *see* Petitioners' Br. at 10, 19-22; Joint Reply Br. at 7-8; Petitioners' Supp. Br. at 7-9; Intervenors' Br. at 6-7, in support of their standing that are consonant with our precedent. Instead, the court blinds itself to what is plainly before it: the administrative record to which, as precedent instructs, the court properly turns to assure itself of the parties' standing. *Defenders of Wildlife*, 504 U.S. at 561-62; *Sierra Club*, 292 F.3d at 899-900.

Accordingly, because the administrative record demonstrates that petitioners have standing to challenge the final

rule, I respectfully dissent.