# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 18, 2011        Decided April 29, 2011

No. 09-1237

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA
AND NATIONAL AUTOMOBILE DEALERS ASSOCIATION,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

COMMONWEALTH OF MASSACHUSETTS, ET AL.,
INTERVENORS

On Petition for Review of an Order
of the Environmental Protection Agency

*Paul D. Clement* argued the cause for petitioners. On the briefs were *Robin S. Conrad*, *Andrew D. Koblenz*, *Douglas I. Greenhaus*, *Matthew G. Paulson*, *Alexandra M. Walsh*, and *Adam J. White*. *Jeffrey A. Lamken* and *Amar D. Sarwal* entered appearances.

*Damien M. Schiff* was on the brief for *amicus curiae* Pacific Legal Foundation in support of petitioners.

*Norman L. Rave Jr.*, Attorney, U.S. Department of Justice,

argued the cause for respondent. With him on the brief was *Michael Horowitz*, Attorney, U.S. Environmental Protection Agency. *John C. Cruden*, Assistant Attorney General, U.S. Department of Justice, entered an appearance.

*Edmund G. Brown, Jr.*, Attorney General, Office of the Attorney General for the State of California, *Kathleen A. Kenealy*, Senior Assistant Attorney General, *Marc N. Melnick*, Deputy Attorney General; *Andrew M. Cuomo*, Attorney General, Office of the Attorney General for the State of New York, *Michael J. Myers*, Assistant Attorney General; *Gary K. King*, Attorney General, Office of the Attorney General for the State of New Mexico; *Joseph R. Biden III*, Attorney General, Office of the Attorney General for the State of Delaware, *Valerie M. Satterfield*, Deputy Attorney General; *Richard Blumenthal*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kimberly P. Massicotte* and *Matthew I. Levine*, Assistant Attorneys General; *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois, *Gerald T. Karr*, Assistant Attorney General; *Martha Coakley*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *William L. Pardee* and *Carol Iancu*, Assistant Attorneys General; *Thomas J. Miller*, Attorney General, Office of the Attorney General for the State of Iowa, *David R. Sheridan*, Assistant Attorney General; *Roberta James*, Assistant Attorney General, Office of the Attorney General for the State of Maryland; *Lori Swanson*, Attorney General, Office of the Attorney General for the State of Minnesota, *Jocelyn F. Olson*, Assistant Attorney General; *Janet T. Mills*, Attorney General, Office of the Attorney General for the State of Maine, *Gerald D. Reid*, Assistant Attorney General; *John Kroger*, Attorney General, Office of the Attorney General for the State of Oregon, *Paul Logan*, Assistant Attorney General; *William H. Sorrell*, Attorney General, Office of the Attorney General for the State of Vermont, *Thea J. Schwartz*, Assistant Attorney General;

*Kevin Auerbacher*, *Jon Martin*, and *Jung Kim*, Deputy Attorneys General, Office of the Attorney General for the State of New Jersey; *Patrick C. Lynch*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Gregory S. Schultz*, Special Assistant Attorney General; *Robert M. McKenna*, Attorney General, Office of the Attorney General for the State of Washington, *Leslie R. Seffern*, Assistant Attorney General; *Susan Shinkman*, Chief Counsel, Commonwealth of Pennsylvania Department of Environmental Protection, *Robert A. Reiley* and *Kristen M. Furlan*, Assistant Counsel; *Kurt R. Wiese*, *Barbara B. Baird*, *David Doniger*, *Joanne Spalding*, *Sean H. Donahue*, *Vickie Patton*, and *Pamela Campos* were on the intervenors' brief in support of respondent. *Frederick D. Augenstern I*, Assistant Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *David G. Bookbinder*, *Beverly M. Conerton*, Assistant Attorney General, Office of the Attorney General for the State of Minnesota, and *Stephen R. Farris*, Assistant Attorney General, Office of the Attorney General for the State of New Mexico, entered appearances.

*Deborah A. Sivas* and *Robb W. Kapla* were on the brief for *amici curiae* Former U.S. EPA Administrators William K. Reilly and Russell E. Train in support of respondent.

*John W. Busterud* was on the joint brief for *amici curiae* Pacific Gas and Electric Corporation and Sempra Energy. *Mark D. Patrizio* entered an appearance.

*Stephen F. Hinchman* and *Matthew F. Pawa* were on the brief for *amici curiae* Car Dealers Adam D. Lee and Charles E. Frank in support of respondent.

*Helen Kang* was on the brief for *amici curiae* Climate Scientists in support of respondent.

Before: HENDERSON, GARLAND, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: The Chamber of Commerce and the National Automobile Dealers Association petition for review of a decision by the Environmental Protection Agency (EPA) granting California a waiver from federal preemption under the Clean Air Act. The waiver allows California to implement its own regulations requiring automobile manufacturers to reduce fleet-average greenhouse gas emissions from new motor vehicles sold in the state. Because we lack jurisdiction to decide this case at this time in a suit brought by these petitioners, we dismiss the petition for review without reaching its merits.

I

The Clean Air Act (CAA) generally bars states from adopting their own emissions standards for new motor vehicles, leaving such regulations to federal control. *See* 42 U.S.C. § 7543(a) ("No State . . . shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines"). Section 7543(b)(1) provides the following exception to federal preemption:

> (b)(1) The Administrator [of EPA] shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards . . . for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable

Federal standards. No such waiver shall be granted if the Administrator finds that –

> (A) the determination of the State is arbitrary and capricious,
> (B) such State does not need such State standards to meet compelling and extraordinary conditions, or
> (C) such State standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title.

42 U.S.C. § 7543(b)(1). As California is the only state that had adopted emissions standards prior to March 30, 1966, it is the only state eligible for a waiver of federal preemption under this provision. *See Ford Motor Co. v. EPA*, 606 F.2d 1293, 1296 (D.C. Cir. 1979). In 1977, however, Congress amended the CAA to permit other states to adopt and enforce standards "identical to the California standards for which a waiver has been granted," without obtaining a separate waiver, provided that both California and the other state have given manufacturers a two-year lead time. 42 U.S.C. § 7507. States that adopt California's motor vehicle emissions program are referred to as "Section 177 states," after the section of the CAA that authorizes them to do so. *See Ford Motor Co.*, 606 F.2d at 1298, 1301 n.54.

In September 2004, the California Air Resources Board (CARB) adopted regulations setting fleet-average greenhouse gas[1] emissions standards for new motor vehicles beginning in Model Year (MY) 2009. *See* CAL. CODE REG. tit. 13 § 1961.1. Under those regulations, manufacturers receive credits for

---

[1]Greenhouse gases include carbon dioxide, methane, nitrous oxides, and hydroflourocarbons. EPA Br. 5.

meeting the standards before MY 2009, for exceeding the standards in subsequent model years, and for selling alternative fuel vehicles. These credits may be banked for later use or sold to another manufacturer. *Id.* § 1961.1(b). If a manufacturer fails to comply in a particular model year, it begins to accrue debits. A manufacturer may incur a debit in any model year without penalty so long as it makes up the debit within five years, either by generating credits or purchasing credits from another manufacturer. *Id.* The standards become stricter as the model years progress. *Id.* § 1961.1(a).

On December 21, 2005, CARB asked EPA to waive federal preemption of California's greenhouse gas emissions standards pursuant to § 7543(b)(1). EPA denied the request. Its decision, published in March 2008, stated that "California does not need its motor vehicle [greenhouse gas] standards to meet compelling and extraordinary conditions," as § 7543(b)(1)(B) requires. Decision Denying a Waiver of Clean Air Act Preemption, 73 Fed. Reg. 12,156, 12,159 (Mar. 6, 2008). The agency recognized that it had previously interpreted § 7543(b)(1)(B) to ask only whether California continued to need its own motor vehicle program as a whole to address compelling and extraordinary conditions. *Id.* at 12,159-61. But it concluded that § 7543(b)(1)(B) was subject to multiple interpretations, and when applied to emissions standards designed to address global as opposed to local or regional air pollution problems, it was best understood to require that EPA assess California's need for the newly proposed standards by themselves. *Id.* California could not satisfy this requirement, EPA reasoned, because California-specific conditions are not "the fundamental causal factors for the air pollution problem of elevated concentrations of greenhouse gases," and, alternatively, because the effects of global climate change in California "are not sufficiently different from conditions in the nation as a whole to justify separate state standards." *Id.* at 12,162, 12,168. Thereafter,

California, several other states, and several environmental groups petitioned this court for review.[2]

On January 21, 2009, CARB asked EPA to reconsider its previous denial. EPA agreed to reconsider and, on July 8, 2009, after a public hearing and comment period, issued a decision granting the waiver. Decision Granting a Waiver of Clean Air Act Preemption, 74 Fed. Reg. 32,744, 32,783 (July 8, 2009). EPA rejected its 2008 interpretation of § 7543(b)(1)(B), returning to its earlier view and finding that California's request satisfied the provision because California still needed its own emissions program "as a whole." *Id.* at 32,762-63. In the alternative, EPA concluded that a waiver was warranted even if it were to examine California's greenhouse gas standards separately under the tests applied in its 2008 decision. The agency found that those standards were intended at least in part to address a local or regional problem because of the "logical link between the local air pollution problem of ozone and . . . [greenhouse gases]." *Id.* at 32,763. It also determined that waiver opponents had not met their burden of demonstrating that "the impacts of global climate change in California are either not significant enough or are not different enough from the rest of the country to be considered compelling and extraordinary conditions." *Id.* at 32,765. Since EPA's waiver decision, at least fourteen states -- including the State of Maryland -- have adopted California's greenhouse gas emissions standards pursuant to Section 177.[3] On September 8, 2009, the Chamber

---

[2]Those petitions were held in abeyance and subsequently dismissed on the parties' joint motion after EPA reversed its denial and granted the waiver, as discussed below. *See California v. EPA*, No. 08-1178 (D.C. Cir. filed May 5, 2008).

[3]*See* ARIZ. ADMIN. CODE § R18-2-1805 (2011); CONN. AGENCIES REGS. § 22a-174-36b (2011); D.C. CODE § 50-731 (2011); FLA.

of Commerce and the National Automobile Dealers Association (NADA) petitioned for judicial review of EPA's waiver decision.

On April 1, 2010, EPA and the National Highway Transportation Safety Administration (NHTSA) jointly issued a national program of greenhouse gas emissions and fuel economy standards for MYs 2012 to 2016. Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards (Final Rule), 75 Fed. Reg. 25,324 (May 7, 2010). The product of an agreement between the federal government, California, and the major automobile manufacturers, the new rules make it possible for automobile manufacturers to sell a "single light-duty national fleet" that satisfies the standards of the EPA, NHTSA, California, and the Section 177 states. *Id.* at 25,324-28. Pursuant to that agreement, California amended its regulations to deem compliance with the national standards compliance with its own for MYs 2012-16. *See* CAL. CODE REGS. tit. 13 § 1961.1(a)(1)(A)(ii). The California-specific standards remain in place until MY 2012, although California adopted "pooling rules" that allow manufacturers to achieve compliance for MYs 2009-11 based on the "pooled" average emissions for the fleets of vehicles sold in California and the Section 177 states. *See id.* § 1961.1(a)(1)(A)(i). Major automobile manufacturers and their trade associations, in turn, made commitments not to contest the

---

ADMIN. CODE ANN. r. 62-285.400 (2011); 06-096-127 ME. CODE R. § 4 (2011); MD. CODE REGS. 26.11.34.02 (2011); 310 MASS. CODE REGS. 7.40(2)(a)(7) (2011); N.J. ADMIN. CODE § 7:27-29.13 (2011); N.M. CODE R. § 20.2.88.102 (2011); N.Y. COMP. CODES R. & REGS. tit. 6, § 218-8.3 (2011); OR. ADMIN. R. 340-257-0050 (2011); 25 PA. CODE. § 126.411 (2011); R.I. ADMIN. CODE 25-4-37:37.2 (2011); 16-3-100 VT. ADMIN. CODE. § 5-1106 (2011); WASH. ADMIN. CODE. § 173-423-070 (2011).

national standards for MYs 2012-16, not to contest the grant of a waiver of CAA preemption to California for its greenhouse gas emissions regulations, and to stay and then dismiss all then-pending litigation challenging those regulations. *See* 75 Fed. Reg. at 25,328.

Although the automobile *manufacturers* agreed not to contest EPA's grant of a waiver to California, the Chamber of Commerce and NADA did not join in that agreement. On behalf of their automobile *dealer* members, the Chamber and NADA bring this challenge to EPA's decision to grant California a preemption waiver under § 7543(b)(1). They argue that § 7543(b)(1)(B) unambiguously requires that EPA assess California's need for the particular standards it presents for a waiver, not for its state-specific emissions program as a whole. Even if there were any ambiguity, the petitioners argue, it was unreasonable for EPA to waive preemption for standards related to a global environmental problem based on California's continuing need to address state-specific conditions. Finally, the petitioners reject EPA's alternative conclusion that the California greenhouse gas standards are proper even under its 2008 test. In their view, California's standards will have no identifiable effect on increased global temperatures, and any effects of climate change in California are not sufficiently different from those experienced elsewhere in the country to justify California-specific regulations.

Before we may reach the merits of these arguments, we must assure ourselves that Article III of the Constitution grants us jurisdiction to decide this case. *See Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83 (1998). Because we conclude that we lack jurisdiction, we dismiss the petition for review.

10

II

Because Article III limits federal judicial jurisdiction to cases and controversies, *see* U.S. CONST. art. III, § 2, federal courts are without authority "to render advisory opinions [or] 'to decide questions that cannot affect the rights of litigants in the case before them,'" *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (citation omitted). The doctrines of standing and mootness reflect and enforce those limitations. *See Davis v. FEC*, 554 U.S. 724, 732-33 (2008); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). "[S]tanding is assessed as of the time a suit commences," *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009), and it ensures that a litigant "allege[s] such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction," *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) (internal quotation marks omitted); *accord Davis*, 554 U.S. at 732. But standing is not enough. "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Davis*, 554 U.S. at 732-33 (internal quotation marks omitted). Thus, "[e]ven where litigation poses a live controversy when filed," we must dismiss a case as moot "if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (internal quotation marks omitted); *see Am. Bar Ass'n v. FTC*, No. 105057, 2011 WL 744659, at *3 (D.C. Cir. Mar. 4, 2011).

Neither the Chamber nor NADA claims standing in its own right; rather, both claim standing to sue on behalf of their members, particularly their members who are automobile dealers. An association has standing to sue on behalf of its

members if: "1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002); *see Laidlaw*, 528 U.S. at 181. Both the Chamber and NADA satisfy the latter two conditions; the only question is whether their automobile dealer members would have standing to sue in their own right. *See also Munsell v. Dep't of Agric.*, 509 F.3d 572, 584 (D.C. Cir. 2007) (holding that when an association sues on behalf of its members, its claims become moot if its members' claims become moot).

When a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured. *Summers*, 129 S. Ct. at 115-521. Rather, the petitioner must specifically "identify members who have suffered the requisite harm." *Id.* at 1152; *see Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815, 820 (D.C. Cir. 2006) (holding that "an organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact. . . . At the very least, the identity of the party suffering an injury in fact must be firmly established."). Because the Chamber has not identified a single member who was or would be injured by EPA's waiver decision, it lacks standing to raise this challenge. *Id.* That flaw is inconsequential, however, because the Chamber's co-petitioner, NADA, has identified allegedly injured members. *See Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) (finding it unnecessary to address the standing of a party whose presence or absence is immaterial to a suit's outcome, where another petitioner clearly has standing). Along with its briefs, NADA has submitted declarations from two of its

automobile dealer members alleging injury as a result of the waiver decision.

We must therefore consider whether the automobile dealers that NADA has identified can satisfy the requirements of standing (as well as whether their claims have become moot). The "irreducible constitutional minimum" requirements of standing are:

> (1) that the plaintiff have suffered an "injury in fact" -- an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of -- the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167 (1997). A petitioner bears the burden of establishing each of these elements. *See Summers*, 129 S. Ct. at 1149; *Bennett*, 520 U.S. at 167-68; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). That burden "is to show a 'substantial probability' that it has been [or will be] injured, that the defendant caused its injury, and that the court could redress that injury." *Sierra Club*, 292 F.3d at 899 (citation omitted).

With respect to the first element of standing, the petitioners do not assert that their dealer members had suffered an "actual" injury at the time they filed their petition for review, *Bennett*, 520 U.S. at 167. Rather, their concern is about future injury. As we have noted before, "any petitioner alleging only future

injuries confronts a significantly more rigorous burden to establish standing." *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989). To qualify for standing, the petitioners must demonstrate that the alleged future injury is "imminent." *Bennett*, 520 U.S. at 167; *see Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III[;] [a] threatened injury must be certainly impending to constitute injury in fact." (internal quotation marks omitted)). And to "shift[] injury from 'conjectural' to 'imminent,'" the petitioners must show that there is a "substantial . . . . probability" of injury. *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010); *see Sierra Club*, 292 F.3d at 898.

With respect to the second and third elements of standing, the petitioners here face an additional problem: California's emissions standards do not regulate automobile dealers, but rather automobile manufacturers -- third parties that have declined to participate in this challenge. *See* CAL. CODE REGS. tit. 13 § 1961.1(a)(1) (requiring *manufacturers* to demonstrate compliance with fleet-average requirements). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting, *inter alia*, *Warth v. Seldin*, 422 U.S. 490, 505 (1975)). Because any injury to the petitioners' members hinges on actions taken by manufacturers, the petitioners carry "the burden of 'adduc[ing] facts showing that those [third-party] choices have been or will be made in such manner as to produce causation and permit redressability of injury,'" *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009) (quoting *Lujan*, 504 U.S. at 562). Again, the petitioners must show that, "absent the [government's allegedly unlawful actions], there is a substantial probability that they would [not be injured] and that, if the court

affords the relief requested, the [injury] will be removed." *Warth*, 422 U.S. at 504; *see Fla. Audobon Soc'y v. Bentsen*, 94 F.3d 658, 666 (D.C. Cir. 1996); *Kurtz v. Baker*, 829 F.2d 1133, 1143-44 (D.C. Cir. 1987).

In the following Part, we apply these principles to the petitioners' claims.

## III

The petitioners allege two kinds of injury in fact to their dealer members. First, they contend that in order to comply with the California standards, automobile manufacturers will have to alter the mix of vehicles ("mix-shift") they would otherwise deliver for sale in California and the other states that have adopted California's standards (the Section 177 states). As a result, dealers in those states will be unable to obtain certain vehicles that their customers want to buy, placing them at a competitive disadvantage with respect to out-of-state dealers. Second, the petitioners argue that enforcement of the new standards will result in an increase in manufacturers' costs, and hence in the price manufacturers charge for the automobiles they deliver to dealers in California and the Section 177 states. For this reason, the petitioners contend, either their dealer members will have to settle for lower profit margins, or they will have to charge higher prices that will cause some prospective customers to forgo purchases.

In support of the petitioners' contention that their dealer members will suffer imminent injury from mix-shifting and price increases caused by EPA's waiver decision, NADA offers the declarations of two of its members: the owner of a Ford dealership near the Sierra Nevada Mountains in California, and the owner of a Lincoln Mercury dealership in Maryland. Neither declaration, however, suffices to demonstrate the

"substantial probability" of injury required to establish the petitioners' standing.

In his declaration, Steve Pleau, the owner of the California dealership, avers that California's fleet-average standards "*could* limit Ford's ability to deliver certain models to California dealers," "*may* force Ford to 'compensate' for delivering high-emitting vehicles by delivering more light-weight, low-emission models than the market demands," and as a consequence "*may* limit [his] ability to obtain and keep in stock a sufficient quantity of the vehicles that [his] customers want or need to buy, particularly those with the most powerful engines available for a given model." Petitioners' Stand. Add. 10 (emphases added). Maryland Lincoln Mercury dealership owner Vincent Trasatti, Jr. is similarly concerned, and similarly equivocal. He worries that Maryland's adoption of the California fleet-average standards "*could* limit [his] ability to maintain the stock that [his] customers want and expect [him] to have" and "*may* limit the ability of Ford Motor Company [which owns Lincoln Mercury] to supply [his] dealership with the vehicle stock necessary to meet consumer demand." *Id.* at 13 (emphases added). "*If*, as a result of Maryland's greenhouse gas standards, Ford Motor Company alters the mix of vehicles that it delivers to Maryland dealers," Trasatti "anticipate[s] that it will be more difficult to stock the mix of vehicles that [his] customers expect." *Id.* (emphasis added). As the petitioners' brief summarizes, "[t]he upshot of these anticipated effects is that NADA's members *may* be forced to pay more for certain vehicles, and *may* be unable to purchase other vehicles at all." Petitioners' Br. 23 (emphases added).

These are just the kind of declarations that we have previously rejected as insufficient to establish standing. In *Center for Biological Diversity*, for example, we held that because the petitioners could "only aver that any significant

adverse effects . . . 'may' occur at some point in the future," they failed to show "the actual, imminent, or 'certainly impending' injury required to establish standing." 563 F.3d at 478; *see also La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996) (holding that the petitioner's claim that "dire consequences . . . would befall it *if*" certain events were to transpire was insufficient to "state an injury sufficiently imminent and concrete for constitutional standing"). Accordingly, if we are to find that the petitioners have standing, it must be based on other evidence before the court. *See Sierra Club*, 292 F.3d at 899 (holding that a petitioner seeking review of administrative action in the court of appeals "must either identify in th[e] record evidence sufficient to support its standing to seek review, or if there is none . . . , submit additional evidence to the court"). As an analysis of that evidence reveals, however, the infirmities of the dealers' declarations are not a matter of drafting. Rather, they accurately reflect the weakness of the record.

Because MYs 2009-11 are now largely behind us, and because the federal government has promulgated national standards for MYs 2012-16, we divide our analysis of the injuries asserted by the petitioners into two time periods. In Subpart A, we examine the likelihood (as measured at the date of the petition) that the dealers identified by NADA would suffer an injury in MYs 2009-11 sufficient to confer standing, as well as whether their claims of injury have been mooted by the passage of time. In Subpart B, we conduct the injury inquiry with regard to MYs 2012-16, and also consider whether the federal government's promulgation of national standards for those years -- and California's adoption of those standards -- has mooted the case for that period.

A

1.  With respect to the alleged harm of mix-shifting, the record evidence indicates that, at the time this petition was filed, it appeared that Ford would not have to mix-shift to meet the California standards in MYs 2009 and 2010, and that it was unlikely to have to do so in MY 2011.  A 2009 CARB study found that, in MY 2009, Ford (as well as GM and Chrysler) would be in fleet-wide compliance by wide margins with their 2009 models.  *See* 74 Fed. Reg. at 32,772.  For MY 2010, the study again projected fleet-wide compliance for Ford, even in the "highly unlikely" event that it "makes no changes to [its] 2009 model year vehicles."  Letter from James N. Goldstene, CARB Exec. Officer to Adm'r Lisa P. Jackson, U.S. EPA, at 25-26 (April 6, 2009) (hereinafter CARB Comments on Reconsideration) (J.A. 3454-55).[4]  CARB also conducted a "worst-case analysis" that found only a small net greenhouse gas debit for Ford and two other manufacturers over the 2009-11 model year period, assuming no change in sales mix or technology after MY 2009.  *Id.* at 24 (J.A. 3453).  And it concluded that, "because this analysis was based on worst case testing, it is likely that testing with additional vehicles in each test group would show even the debiting companies in compliance" throughout the 2009-11 period.  *Id.*; *see* 74 Fed. Reg. at 32,772.

The two other studies in the record produced similar results.  A National Resources Defense Council analysis cited by EPA projected industry-wide compliance in MYs 2009 and 2010 by wide margins, and industry-wide compliance in MY 2011 through the use of banked credits.  *See* 74 Fed. Reg. at 32,772.

---

[4]The study also projected fleet-wide compliance for GM and Chrysler in MY 2010, with the use of accumulated credits.  CARB Comments on Reconsideration 26 (J.A. 3455).

A study by Energy and Environmental Analysis, Inc. (EEA), which took into account manufacturers' existing product plans, found that Ford "will comply" in MY 2009 and that Ford "can likely comply" in MY 2010 "by either using banked credits from 2009 or with small adjustments to the power train mix and sales mix sold in California, if necessary." ENERGY AND ENVTL. ANALYSIS, INC., AUTO-MANUFACTURERS ABILITY TO COMPLY WITH CALIFORNIA GHG STANDARDS THROUGH 2012 (2009) (hereinafter EEA Report) (J.A. 3330). EEA concluded that Ford and the other manufacturers "could require additional efforts such as air conditioner improvements to comply" with the MY 2011 standards. *Id.* Air-conditioner improvements, however, are not the kind of mix-shifting injury that the petitioners assert.

Not only have the petitioners failed to establish that at the time this suit was initiated there was a substantial probability that Ford would have to mix-shift in California (or Maryland) during MYs 2009-11, but they have also failed to establish that even if such mix-shifting were to be required, it would have an effect on the ability of the identified Ford dealers to meet their customers' demands. *See Am. Chemistry Council*, 468 F.3d at 820 (holding that "an organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered injury-in-fact"). For example, there is no evidence -- nor even any assertion -- that if Ford had to mix-shift to comply with California's fleet-average requirements, it would be unable to do so by increasing the proportion of smaller and more fuel-efficient vehicles provided to dealers in urban areas like San Francisco while maintaining its supply of trucks and SUVs to dealers near the Sierra Nevadas like Mr. Pleau. *See* Press Release, Ford Motor Co., New Products Drive Ford's October Sales, Share Gains (Nov. 3, 2009) (EPA Br. Attachment 2). We therefore cannot conclude that the injury the petitioners predicted was substantially probable.

2. In addition to mix-shifting, the petitioners contend that enforcement of the new California standards will result in an increase in the price of automobiles, forcing dealers to settle for a lower profit margin or to charge higher prices -- which, in turn, will cause some prospective customers to forgo in-state purchases. Neither of the two dealer declarations, however, addresses the price-increase issue at all. Instead, the petitioners cite a 2005 CARB estimate that new-vehicle costs would rise by an average of approximately $1,000 per vehicle under the California regulations. CARB, Final Statement of Reasons, at 11 Table II-2 (Aug. 4, 2005) (J.A. 860). But CARB predicted a gradual escalation in price, with the increase not reaching $1,000 until 2016. For MYs 2009 through 2011, CARB's cost projections were substantially lower. *Id.*[5]

More important, by the time EPA actually granted California's waiver in July 2009, market conditions had changed substantially from those upon which CARB's 2005 estimate was based. As we have just discussed, studies CARB conducted in early 2009 -- based upon data from that model year -- found it unlikely that Ford would have to change its sales mix *or* technology to comply with the California standards through MY 2011. CARB Comments on Reconsideration 23-26 (J.A. 3452-55). This was because manufacturers were already employing enhanced greenhouse gas-reducing technologies necessary for compliance. *Id.* at 19 (J.A. 3448). Indeed, Ford's December 2008 business plan -- issued seven months before EPA granted the waiver -- described the automaker's independent intention to invest $14 billion to improve its fleet fuel economy "from the

---

[5]For example, for passenger cars, small trucks, and small SUVs, CARB estimated average cost increases of $17 in 2009, $58 in 2010, and $230 in 2011. The projected increase for large trucks and SUVs in 2011 was $176. *See* CARB, Final Statement of Reasons, at 11 Table II-2 (J.A. 860).

2005 model year baseline every year," leading to 14 percent improvement by 2009 and 26 percent improvement by 2012. Ford Motor Co. Business Plan, Submitted to the House Financial Services Committee, at 14 (Dec. 2, 2008) (cited in Decision Granting a Waiver, 74 Fed. Reg. at 32,773 n.181). Hence, the petitioners have failed to demonstrate a substantial probability that the waiver -- as distinct from Ford's own business plans -- would cause it injury in the form of price increases during MYs 2009-11.

3. Finally, we note that by the date of oral argument, MYs 2009 and 2010 were already over, and MY 2011 (which began in the last quarter of 2010) was well underway. The petitioners have submitted no evidence that their members actually suffered injury during any part of that period. Even if they had, vacating California's waiver could not possibly affect the mix or price of automobiles delivered during the period that has passed. Indeed, the petitioners acknowledged at oral argument that vacating the waiver likely would have no effect during the balance of MY 2011 either. Oral Arg. Recording 4:20-:55. Hence, even if the petitioners had been able to establish injury in MYs 2009-11 sufficient to confer standing, any injury that did occur during that period is now moot. Our jurisdiction to review this challenge therefore hinges entirely upon the impact that the waiver decision will have on the petitioners' members during MYs 2012-16, the remainder of the time during which the California waiver applies.

B

1. Turning to MYs 2012-16, we first consider whether the petitioners have shown that NADA's identified members will suffer the kind of injury requisite for standing during those years. Although the argument that the dealers will be harmed by higher vehicle prices or mix-shifting during that period is

stronger than for MYs 2009-11, their standing is still problematic.

As noted above, CARB's 2005 estimate projected considerably greater price increases for MYs 2012-16 than for the earlier period.[6] And with respect to mix-shifting, there is certainly evidence -- although not specific to Ford -- that manufacturers will have more difficulty complying with California's standards in MYs 2012-16 without altering the mix of vehicles they sell in California and the Section 177 states.[7]

But even if the petitioners can establish the imminence of their alleged mix-shifting and price-increase injuries, they still

---

[6]The same study, however, projected that by the time the California standards are fully phased in, any increase in average vehicle costs will be more than offset by fuel-cost savings over the life of the vehicle, resulting in a net decrease in the effective price of automobiles -- even on the assumption that gasoline prices are an unrealistically low $1.74 per gallon. CARB, Final Statement of Reasons, at 11 (J.A. 860).

[7]The EEA Report, on which the petitioners rely, does not conclude that manufacturers are likely to mix-shift, only that compliance with the MY 2012 requirements "may require credit trading and banked past and future credits over and above credits from air conditioner improvements and introduction of alternative fuel vehicles." EEA Report (J.A. 3331). Similarly, although Chrysler did state that "it may be necessary to restrict sales of certain vehicle models" if EPA granted the waiver, it characterized that possibility as a "last resort" and said it would "try its best to comply using available technology." CARB Comments on Reconsideration 27 (J.A. 3456); *see also* 74 Fed. Reg. at 32,773. The comments of industry groups were less equivocal (although not manufacturer-specific), warning that "the only means by which most large-volume manufacturers will be able to meet the CARB standards [in 2012-16] is by 'mix-shifting' their product lines." 74 Fed. Reg. at 32,774.

face difficulty satisfying the remaining prongs of standing analysis: causation and redressability. In public statements cited in the appellate record, Ford has said that it sees rising consumer demand for fuel-efficient vehicles as key to its long-term growth, and that it is developing its product line accordingly.[8] These and other statements suggest that Ford's own market analysis may independently lead it to implement technology that will continue to meet the California standards, even in the absence of regulatory compulsion. *See* EPA/NHTSA Joint Public Hearing Transcript, at 13-14 (Oct. 21, 2009) (*Amici* Car Dealers Br. Attachment 7) (testimony by Ford Vice President that Ford has a "long-term sustainability plan . . . to improv[e] the fuel economy and reduc[e] the greenhouse gas emissions of our fleet," which "includes converting three truck and SUV plants to build small cars, re-tooling our powertrain facilities to manufacture EcoBoost engines and . . . increasing our hybrid offerings," because "it is the right thing to do for our customers"); 74 Fed. Reg. at 32,773 (citing testimony that Ford "plans to improve the average fuel economy by . . . 36 percent by 2015"). Petitioners have offered no evidence to the contrary, and no evidence that, if the waiver were vacated, Ford would proceed on a different course more favorable to the petitioners. *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (holding that a plaintiff lacks standing where its claimed injury "results from the independent action of some third party not before the court"); *see also United Transp. Union*, 891 F.2d at 915 (holding that, "since any hypothetical future injury could also occur even in the absence

---

[8]*See, e.g.*, Jamie LaReau, *Ford goes green, small, high-tech*, Automotive News, Aug. 2, 2010 (*Amici* Car Dealers Br. Attachment 4); Press Release, Ford Motor Co., New Products Drive Ford's October Sales, Share Gains (Nov. 3, 2009) (EPA Br. Attachment 2).

of the challenged [agency action], a favorable decision from this court would not be 'likely' to redress it").[9]

2. In any event, we need not definitively decide whether the petitioners have carried their burden of establishing standing with respect to injury in MYs 2012-16 because the petition is plainly moot for those years. As recounted in Part I, after the petition for review was filed, EPA and NHTSA promulgated national greenhouse gas standards for MYs 2012-16, *see* 75 Fed. Reg. 25,324, and California amended its regulations to deem compliance with those national standards as compliance with its own, *see* CAL. CODE REGS. tit. 13 § 1961.1(a)(1)(A)(ii). Beginning in MY 2012, automobile manufacturers will have to

---

[9]A comparison of the relatively weak record in this case to the abundant evidence we found sufficient to establish standing in *Competitive Enterprise Institute v. NHTSA*, 901 F.2d 107 (D.C. Cir. 1990), is instructive. In that case, an association challenged the agency's decision to require higher fuel economy standards than the association thought appropriate, contending that those standards hampered its members' ability to purchase larger passenger cars. In contrast to the disputed future injury posited by the Ford dealers in this case, the affidavits offered in *Competitive Enterprise Institute* averred that the members had already suffered actual injury: they had "looked for but [had] been unable to find new cars of large size, such as station wagons, in a price range they could afford." *Id.* at 112-13. Nor did the petitioners suffer from the causation and redressability problems that we discuss in the text above. "The evidence supporting th[e] causal link" between the standards and the decreased production of large automobiles was "contained in the agency's own factfinding." *Id.* at 114. There was "overwhelming evidence" in the record "that the auto manufacturers' . . . product mix decisions [were] not made substantially independent of the government's imposition of fuel economy standards," *id.* at 116, and that "manufacturers [were] likely to respond to lower . . . standards by continuing or expanding production of larger, heavier vehicles," *id.* at 117.

comply with the national standards whether we vacate the waiver decision or not. Hence, the national standards, and not EPA's waiver decision, will be responsible for any injury NADA members may suffer from higher prices or mix-shifting in MYs 2012-16. Moreover, the specific injury that the petitioners attribute to mix-shifting -- the risk that California dealers will lose sales to dealers in neighboring states that have not adopted California's regulations -- will disappear entirely. Manufacturers selling to dealers outside of California and the Section 177 states will be subject to the same standards as those selling to dealers within them. Accordingly, because the California exception will not be the cause of any injury to the petitioners, their petition is moot.[10]

The petitioners acknowledge that, beginning in MY 2012, EPA's national greenhouse gas standards will be "virtually identical" to California's standards. Petitioners' Br. 8. Indeed, notwithstanding their use of "virtually" as a qualifier, the petitioners do not describe any way in which the standards will differ. Nonetheless, they suggest five reasons why the waiver decision will have other continuing effects on NADA's members sufficient to preserve their entitlement to review. Those asserted continuing effects, considered individually or cumulatively, fail to establish that the petitioners maintain a

---

[10]*See Princeton Univ. v. Schmid*, 455 U.S. 100, 103 (1982) (finding the case moot because, "while the case was pending on appeal, the University substantially amended its regulations"); *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) (holding that the agency's revision of challenged regulations mooted a challenge to those regulations); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458-59 (D.C. Cir. 1998) (holding that California's elimination of a regulatory requirement mooted a challenge to that requirement); *Motor & Equip. Mfrs. Ass'n, Inc. v. EPA*, 627 F.2d 1095, 1105 n.18 (D.C. Cir. 1979) (same).

"legally cognizable interest in the outcome," *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (internal quotation marks omitted).

First, the petitioners argue that, even though California and federal standards will be virtually identical in MY 2012, their members will suffer injury because they will be subject to enforcement by both EPA and California if they sell noncompliant cars. But as the respondents point out, there is no such thing as a "noncompliant car" for purposes of the California greenhouse gas standards. Those standards impose *fleet*-average requirements, *see* CAL. CODE REGS. tit. 13 § 1961.1(a)(1), and accordingly regulate manufacturers, not dealers, *id.*; *see* Petitioners' Br. 7 (acknowledging that California's "standards do not . . . require that individual vehicles meet certain emission levels," but rather require compliance "on a California *fleet-wide basis*" (emphasis in original)). Thus, an automobile *manufacturer* that fails to comply with the fleet-average requirements in MY 2012 could conceivably face penalties from both the federal government and California. But there is no evidence in the record that the possibility of dual enforcement against manufacturers will cause any more mix-shifting or price increases -- the only injuries identified for dealers -- than federal enforcement alone.

Second, the petitioners point out that some of the Section 177 states that enforce California's standards have not yet amended their regulations to acquiesce in the national standards as California has. As a result, the petitioners contend, manufacturers will have to comply with the original California standards in those states, and the result will be mix-shifting and price increases for NADA's dealer members in those states. But the only two dealer-members that NADA has specifically identified as injured by the California exemption are located in states that have already expressly acquiesced in the federal

standards: California and Maryland.[11] If NADA has standing, it is only because at least one of those dealers has standing, *see Summers*, 129 S. Ct. at 1152, and if the claims of both are moot, then NADA's claims are moot as well, *see Munsell* 509 F.3d at 584. In any event, all of the Section 177 states are statutorily obligated to ensure that any "standards relating to control of emissions" that they seek to enforce are "*identical* to the California standards for which a waiver has been granted." 42 U.S.C. § 7507 (emphasis added). Because those California standards now provide that compliance with the federal standards constitutes compliance with the state's for MYs 2012-16, so must the standards of all the Section 177 states.[12]

---

[11]California has already amended its regulations to accept compliance with the national standards, *see* CAL. CODE REGS. tit. 13 § 1961.1(a)(1)(A)(ii), and Maryland has announced that it will do so as well, *see* 38 Md. Reg. 67, 125-27 (Jan. 14, 2011).

[12]In a footnote to their reply brief, petitioners worry that California's deemed-to-comply amendment might be considered an "enforcement mechanism" rather than a "standard," and hence not be subject to the "identicality requirement" of § 7507. *See* Petitioners' Reply Br. 7 n.2 (citing *Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Envtl. Conservation*, 79 F.3d 1298, 1305 (2d Cir. 1996) (distinguishing between standards and enforcement mechanisms)). Although that issue is not before us on this appeal, we find such a result highly unlikely. California's amendment modifies the substantive emissions standards with which manufacturers must comply in MY 2012, and it therefore bears little resemblance to "enforcement mechanisms" such as "periodic testing and maintenance requirements," *Am. Auto. Mfrs. Ass'n v. Cahill*, 152 F.3d 196, 200 (2d Cir.1998). California agrees, *see* California Br. 8, and the petitioners acknowledge that this is "the better view," Oral Arg. Recording 13:20-14:00.

Third, the petitioners contend that they are under a continuing threat of injury from California's standards because, if the federal standards are invalidated in a pending court case, the California standards could be reimposed. But the federal regulations are currently in force, subject to the usual presumption of validity, *see New York v. EPA*, 413 F.3d 3, 22 (D.C. Cir. 2005), and at this point the possibility that they may be invalidated is nothing more than speculation.[13] Nor is there any way in which we can realistically move that possibility out of speculation's realm: the petitioners have not even attempted to set forth the arguments in favor and against such an invalidation; even if they had, we would be disinclined to conduct the kind of "trial within a trial" necessary to assess the likelihood that a challenge to the federal standards would prevail. The prospect that litigants could be injured "if" a court were someday to invalidate the federal regulations and "if" California thereafter were to reimpose its standards, is little different from the prospect that any litigant could be injured "if" EPA (or Congress) were eventually to enact a rule it presently had under consideration. To seek judicial review of such a contemplated-but-not-yet-enacted rule is to ask the court for an advisory opinion in connection with an event that may never come to pass. Federal courts decline to offer such opinions

---

[13]In *Louisiana Environmental Action Network v. Browner*, this court rejected a petitioner's standing to challenge EPA regulations that would allow EPA to approve a state air pollution requirement and then enforce it as a federal requirement. 87 F.3d at 1383-84. The petitioner had "suggest[ed] that federal enforcement of state regulations may mean that, if a state court voids the state air-pollution rule, federal officials still may enforce it." *Id.* at 1384. Acknowledging that this prediction "may be possible," we concluded that it was not "so probable as to convince us that the [challenged regulations] somehow affect the utilities petitioners in their current conduct to the extent that their 'injury' may be deemed actual or imminent at this time." *Id.*

because "Article III of the Constitution limits federal 'Judicial Power' . . . to 'Cases' and 'Controversies,'" a limitation that "defines the 'role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government.'" *Geraghty*, 445 U.S. at 395-96.[14]

Fourth, the petitioners appear to suggest that, even if the federal standards are not invalidated, California "could withdraw its pledge to follow [those] standards whenever it likes and enforce its state-specific standards instead." Petitioners' Reply Br. 7. But "the mere power to reenact a challenged law is not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists. Rather, there must be evidence indicating that the challenged law likely will be reenacted."

---

[14]We acknowledge there is an argument that the sixty-day window for judicial review specified in 42 U.S.C. § 7607(b) could bar the petitioners from challenging the 2009 waiver decision if they cannot sue until (and unless) the federal regulations are invalidated. We note, however, that § 7607(b) itself recognizes an exception to the sixty-day bar for petitions "based solely on grounds arising after such sixtieth day." § 7607(b)(1). And, as we have repeatedly held, "[this] provision for judicial review . . . for suits based on newly arising grounds encompasse[s] the occurrence of an event that ripens a claim." *Am. Road & Transp. Builders Ass'n v. EPA*, 588 F.3d 1109, 1113-14 (D.C. Cir. 2009); *see La. Envtl Action Network*, 87 F.3d at 1381 (stating that "[i]f, at some later time, one or more of the parties develops a justiciable claim, they will be able to seek judicial relief"). Although we do not now decide whether this exception would permit the petitioners to reassert their challenge in the event the federal standards are vacated and the California standards reimposed, we do note that our precedent permitting an exception to the sixty-day window for newly ripened suits renders even more speculative the petitioners' claim that they must be permitted to sue now to prevent the possibility of future injury.

*Nat'l Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997); *see Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010) ("[T]he 'mere possibility' than an agency might rescind amendments to its actions or regulations does not enliven a moot controversy." (citation omitted)).[15]  "There is no evidence in the record to suggest that [California] might repeal the [deemed-to-comply amendment]" while the federal regulations remain intact, *Nat'l Black Police Ass'n*, 108 F.3d at 349, and the petitioners have offered no reason why California would wish to do so.  In any event, the petitioners do not anywhere describe the differences between the original California and the new federal standards for MY 2012-16, and hence do not show how enforcement of the state-specific regulations -- even if reimposed -- would cause them injury beyond that caused by intact federal regulations.

Finally, the petitioners contend that "the current Waiver Decision may make it easier for California to obtain waivers for future [greenhouse gas] standards and regulations -- and concomitantly more *difficult* for NADA's members to challenge those waiver requests."  Petitioners' Br. 26-27.  They note that, "[a]ccording to EPA, if a California emissions standard has

---

[15]As we said in a recent case involving FTC regulations:

> It does not matter that the FTC might hereafter pursue notice-and-comment rulemaking to promulgate *new* rules . . . .  Nor does it matter that the agency may pursue a *new* enforcement policy . . . .  These are merely hypothetical possibilities -- indeed, the parties may even view them as likely possibilities.  But they are nothing more than *possibilities* regarding regulations . . . that do not presently exist.  This is not enough to give rise to a live dispute. . . .  The case now before the court is moot."

*Am. Bar Ass'n v. FTC*, 2011 WL 744659, at *5.

already received a Clean Air Act waiver, then the agency is not required to subject *amendments* to that standard to 'full waiver analysis,' so long as the amendments are 'within-the-scope' of a previously granted waiver." *Id.* at 26  (quoting 75 Fed. Reg. 11,878, 11,879 (Mar. 12, 2010)).  Thus, EPA's approval of the instant waiver request assertedly "eases the standards under which certain, future waiver requests are likely to be considered" by the agency.  *Id.*

This possible future injury is again speculative.  Keeping in mind the difficulty the petitioners have had in showing that the current California regulations will injure NADA's identified members, it is even more speculative that California will someday amend those regulations in a way that both injures those members and comes within the scope of the current waiver.  Moreover, even if that eventuality should come to pass, it seems at least more likely than not that NADA would then be able to challenge the current waiver -- and thus eliminate its precedential value.  *See supra* note 14.

The petitioners maintain that the possibility that this injury will come to pass is more than speculative because California has already announced that it is developing stricter greenhouse gas standards for MYs 2017-25.  *See* Petitioners' Reply Br. 8 n.3 (citing *Statement of the California Air Resources Board Regarding Future Passenger Vehicle Greenhouse Gas Emission Standards*, at 1 (May 21, 2010), *available at* http://www.arb.ca.gov/newsrel/2010/VehState.pdf (hereinafter CARB Statement on Future Standards)).   But the federal government has also announced plans to develop "stringent" greenhouse gas and fuel economy standards for those same model years.  *See* 2017 and Later Model Year Light Duty Vehicle GHG Emissions and CAFE Standards (Notice of Intent), 75 Fed. Reg. 62,739, 62,741 (Oct. 13, 2010). According to the federal announcement, stakeholders agree that it will be

important to "maintain a single nationwide program" in those years, *id.* at 62,742, and California's announcement states that its goal is that "compliance with new national standards after 2016 may serve to meet the new 2017-2025 model year California standards," CARB Statement on Future Standards, at 1. Thus, far from removing the petitioners' asserted injury from the realm of speculation, these announcements only reinforce the conclusion that it is entirely speculative.

3. In sum, even if NADA had standing when it initially sought review, "events have so transpired that [our] decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future," *Clarke*, 915 F.2d at 701 (internal quotation marks omitted). Because "this case has 'lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law,'" *Schmid*, 455 U.S. at 103 (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969) (per curiam)), it is now moot.

IV

At oral argument, the petitioners suggested that, if we conclude the promulgation of national greenhouse gas standards for MYs 2012-16 renders this suit moot, we should vacate EPA's waiver decision. The petitioners' suggestion of vacatur is forfeited, however, as they raised it for the first time at oral argument. *See Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840, 843 (7th Cir. 1998) (holding that the appellant waived its request for vacatur by not raising it until oral argument); *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003) (holding that contentions first raised at oral argument are waived); *see also United States v. Munsingwear*, 340 U.S. 36, 40-41 (1950) (holding that a party can waive its right to vacatur

of a lower-court order that becomes moot on appeal). In any event, vacatur is not called for here.

In *United States v. Munsingwear*, the Supreme Court noted that vacatur "is commonly utilized . . . to prevent a [district court] judgment, unreviewable because of mootness, from spawning any legal consequences." 340 U.S. at 40. In *A.L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 329-30 (1961), the Court extended this practice to "unreviewed administrative orders," vacating an order of the Interstate Commerce Commission (ICC) authorizing proposed railroad rates because -- before the ICC's approval order could be judicially reviewed -- the appellee railroads mooted the case by withdrawing the rates. We, too, have routinely vacated agency orders rendered unreviewable by intervening events. *See, e.g.*, *Am. Family Life Ins. Co. v. FCC*, 129 F.3d 625, 630-31 (1997) (vacating FCC order, which found that AFLAC had violated the Communications Act, after the case became moot because AFLAC sold its television stations and dissolved); *Radiofone v. FCC*, 759 F.2d 936 (D.C. Cir. 1985) (concluding that the petitioners' challenge to an FCC ruling in favor of a competitor was moot because the competitor went out of business, and vacating the ruling at issue).

But the EPA decision at issue here is not unreviewable; it is only the challenge brought by the petitioners in this case that is beyond our authority to review. EPA's promulgation of national greenhouse gas emissions standards, and California's acquiescence in those standards, have rendered the *dealers'* already tentative claim of injury so speculative that a suit on their behalf cannot satisfy Article III's case-or-controversy requirement. If the suit had been brought on behalf of automobile *manufacturers* rather than dealers, however, it would not necessarily have been mooted by those developments -- provided that the manufacturers could persuasively show they

would suffer additional injury from the costs of direct, albeit duplicative, regulation by California.  To vacate the agency's action under the present circumstances would thus be akin to vacating a district court decision that was not appealed by either of the principal parties, but rather by an intervenor whose particular interest in the matter had evaporated before the appellate court could rule.

Moreover, notwithstanding the absence of continuing injury to the petitioner automobile dealers, California retains a sovereign interest in being able to enforce its own regulations against automobile manufacturers -- just as states have a sovereign interest in enforcing state drug laws even if they coincide with federal drug laws.  We will not vacate the waiver decision granting California this enforcement authority simply because the particular petitioners before us lack the requisite personal stake to sustain their challenge.

Indeed, in his separate opinion in *Radiofone v. FCC*, then-Judge Scalia cautioned against such an application of the *Munsingwear* rule.  That rule, he explained, "does not apply to [agency orders] *automatically*, since what moots the dispute before us does not necessarily nullify the agency action."  759 F.2d at 940 (Scalia, J., concurring).  In *Radiophone* itself, he noted, it was appropriate to vacate the challenged FCC ruling because the challengers' case was mooted when the recipient of the favorable ruling -- a competitor of the challengers -- went out of business.  But, Judge Scalia pointed out, while "the dispute *before us* would just as effectively be mooted" if the challengers rather than the recipient had gone out of business, in that case "the agency action would continue to have present concrete effect" and "we would assuredly not vacate the agency's approval of [the recipient's] continuing operations." *Id.* at 940-41.

Likewise here, we would assuredly not vacate the agency's approval of California's standards if the case were mooted simply because the two identified automobile dealers had gone out of business. Nor will we vacate it because intervening events have obviated any harm those dealers might suffer as a consequence of the standards. Notwithstanding the absence of a continuing concrete effect on the petitioners, the waiver decision "continue[s] to have present concrete effect" on California (and likely on manufacturers as well) by authorizing the state's standards. And that is sufficient to render "the equitable remedy of vacatur," *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994), inappropriate in this case.

V

"In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law. Except when necessary in the execution of that function, courts have no charter to review and revise . . . executive action." *Summers*, 129 S. Ct. at 1148. Here, there is no such necessity. Even if EPA's decision to grant California a waiver for its emissions standards once posed an imminent threat of injury to the petitioners -- which is far from clear -- the agency's subsequent adoption of federal standards has eliminated any independent threat that may have existed. Under these circumstances, the petitioners' challenge amounts to a request for an advisory opinion regarding the waiver's validity. And that, of course, is precisely the kind of opinion we are without authority to give. *Preiser v. Newkirk*, 422 U.S. at 401.

For the foregoing reasons, the petition for review is dismissed for want of jurisdiction.

*So ordered.*